## AFFIDAVIT

I, Jordan Knight, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I have been employed with the United States Secret Service ("Secret Service") since 2014, and I am currently a Special Agent assigned to the New England Cyber Fraud Task Force. As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States. My duties include the investigation of wire fraud, bank fraud, access device fraud, and identity theft, among other things. I have completed extensive Secret Service training, including courses related to constitutional law, criminal investigations, and financial crimes. I hold a B.A. in Criminology from Central Connecticut State University. Prior to becoming a Special Agent, I was a Sergeant with the Uniformed Division of the Secret Service in Washington, D.C.

2. I am currently investigating OMAR THOMPSON ("THOMPSON") and ▮▮▮▮▮▮▮▮ ("CC-1") for their involvement in wire fraud, in violation of Title 18, United States Code, Section 1343 ("the TARGET OFFENSE").

3. I make this affidavit in support of an application for a criminal complaint charging THOMPSON with the TARGET OFFENSE, and for a warrant for THOMPSON's arrest.

4. Based on the facts set forth below, there is probable cause to believe that THOMPSON committed the TARGET OFFENSE.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience investigating financial crimes, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show that there is sufficient probable cause to support the issuance of the requested complaint and arrest warrant. It does not

purport to set forth all of my knowledge of or investigation into this matter. Unless indicated otherwise, all conversations and statements described below are related in substance and in part and all dates are approximate.

## PROBABLE CAUSE

*Pandemic Unemployment Assistance*

6. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was signed into law. The CARES Act created a temporary federal unemployment insurance program called Pandemic Unemployment Assistance ("PUA"). PUA provides unemployment insurance benefits for individuals who are not eligible for other types of unemployment benefits (*e.g.*, the self-employed, independent contractors, or gig economy workers). PUA provided payments for these benefits beginning on or after January 27, 2020 and ending before December 31, 2020, for a maximum period of 39 weeks. On or about December 27, 2020, PUA recipients were granted 13 weeks of extended benefits. The American Rescue Act has now further extended PUA benefits through September 4, 2021.

7. The Massachusetts Department of Unemployment Assistance ("DUA") administers and manages the PUA program in Massachusetts. Residents may apply to DUA for PUA benefits through an online portal over which they submit certain personally identifiable information ("PII"). The PUA claims submitted to DUA are processed on a server in Colorado. I understand that PUA claims cause wires to be transmitted to and/or from this Colorado-based server. The PUA claims information is also transmitted to DUA headquarters, located in Suffolk County in Boston, Massachusetts, for purposes of review by DUA employees, maintenance, and to facilitate correspondence with claimants.

8. As part of the PUA application process, the claimant provides their first and last

name, Social Security number ("SSN"), date of birth, and a residential and mailing address. In addition, the claimant selects a preferred payment method: direct deposit or payment of their benefit onto a debit card. The claimant also provides a phone number and an email address to be used by DUA to provide updates, contact the claimant, and for authentication purposes.

9. The claimant must certify that they were working in Massachusetts, and not working in another state besides Massachusetts, when they were impacted by COVID-19.

10. The claimant must also certify that the information is accurate, and that the claimant is submitting the claim on behalf of himself or herself and not on behalf of another person. The claimant must specifically acknowledge that "[c]laiming unemployment benefits for someone else is against the law" and "[a]ccessing someone else's unemployment insurance claim is against the law."

*THOMPSON*

11. According to T-Mobile records, THOMPSON's phone number is ▮▮▮▮7515 ("THOMPSON's phone"). Google records reflect that THOMPSON's phone number was used to create the email account ▮▮▮▮@gmail.com ("THOMPSON's email").

12. Verizon records reflect that THOMPSON resides at ▮▮▮▮ Paterson, New Jersey. According to Verizon records, the IP address for that location is ▮▮▮▮.183 ("THOMPSON's IP address"), and the account lists THOMPSON's phone as the daytime telephone number and THOMPSON's email as the primary email address. Human surveillance has also confirmed that THOMPSON resides at that address.

*CC-1*

13. Comcast records reflect that CC-1 resides at ▮▮▮▮ ▮▮▮▮. According to Comcast records, the IP address for that location is ▮▮▮▮

("CC-1's IP address"). For CC-1's contact information, Comcast records list the phone number ▬▬▬▬▬ ("CC-1's phone").

14.  CC-1 has an AOL email account in her name ▬▬▬▬@aol.com, or "CC-1's email"). AOL records for that account list CC-1's phone as a backup phone number and show that it has been accessed using CC-1's IP address on multiple occasions.

15.  According to DUA records, on April 29, 2020, a PUA claim in the name of CC-1 was submitted from CC-1's IP address. The claim listed CC-1's phone number, CC-1's email, and CC-1's residential address.

*Overview of the THOMPSON and CC-1 Conspiracy*

16.  Based on information from DUA, email correspondence, and telecommunication and bank records, there is probable cause to believe that THOMPSON and CC-1 have worked together to submit PUA claims in Massachusetts on behalf of others and that those individuals were not entitled to benefits.

17.  According to DUA records, between April and June 2020, the IP addresses of THOMPSON and CC-1 were used to file more than 100 PUA claims with DUA, which have paid out more than $1,200,000 in DUA funds. Approximately 50 of those claims, which have paid out approximately $338,000 in DUA funds, were made on behalf of individuals who had both an out-of-state driver's license and an out-of-state mailing address at the time their PUA claim was submitted.[1] In certain instances, these individuals had also already filed for unemployment

---

[1] Where a claimant does not have a Massachusetts driver's license or mailing address, that suggests they neither live nor work in Massachusetts and are therefore not entitled to receive PUA benefits from DUA.

benefits in another state.

18. Further, bank records reflect that THOMPSON and CC-1 each received payments from individuals on whose behalf THOMPSON and CC-1 filed PUA claims.

19. During that same timeframe, THOMPSON's email records reveal multiple email exchanges with CC-1 containing PII used to submit the PUA claims. THOMPSON's T-Mobile records also reflect incoming and outgoing phone calls and text messages with CC-1 during this period.

20. Some of the fraudulent PUA claims submitted by THOMPSON and CC-1, along with evidence of THOMPSON and CC-1 conspiring to submit those claims, are detailed below.

*CC-1's Submission of THOMPSON's Fraudulent PUA Claim*

21. DUA records reflect that on May 12, 2020, a PUA claim in THOMPSON's name was submitted to DUA from CC-1's IP address. The claim listed THOMPSON's name and date of birth, THOMPSON's phone, THOMPSON's email, and directed funds to a TD Bank account in THOMPSON's name. That claim has paid out over $19,000 in DUA funds.

22. Approximately two weeks earlier, on April 29, 2020, THOMPSON sent CC-1 an email with the subject line "Unemployment" that contained THOMPSON's PII. T-Mobile records reflect that, less than four hours later, THOMPSON called and texted CC-1.

23. After THOMPSON's PUA claim was submitted, between May 15, 2020 and May 20, 2020, THOMPSON's TD Bank records reflect electronic transfers totaling $1,400 to CC-1

made via Cash App.[2]  According to T-Mobile records, THOMPSON and CC-1 also exchanged several text messages during those five days.  Based on my training and experience investigating fraud conspiracies, I believe that these were likely payments from THOMPSON to CC-1 made in exchange for CC-1 filing THOMPSON's fraudulent PUA claim.

24.     At the time CC-1 filed THOMPSON's claim with DUA, THOMPSON was not entitled to assistance from DUA because he had already filed for unemployment in another state. Department of Labor records reflect that THOMPSON filed for unemployment assistance in New Jersey on April 12, 2020, just one month prior to his Massachusetts claim.

25.     THOMPSON was also not entitled to assistance from DUA because THOMPSON was neither living nor working in Massachusetts.  When his PUA claim was filed with DUA, THOMPSON had a New York State driver's license that listed a residential address in New York City.   THOMPSON's social media accounts (*e.g.*, Twitter and Instagram) also identify THOMPSON as previously living in "Harlem" (a neighborhood of New York City).  Further, on April 8, 2019, according to multiple databases available to law enforcement, THOMPSON registered a business, Ocean of Laughs Productions LLC, at THOMPSON's address in New Jersey.   That registration remains active, listing THOMPSON as the registered agent. THOMPSON discussed this business on his Instagram page, where he posted a photograph of what appears to be THOMPSON holding a State of New Jersey Certificate of Authority, commenting, "Ocean of Laughs Productions is up and running.  Today April 8th 2019, I became the owner of

---

[2] The Cash App is an online payment application that allows individuals to send money directly to each other, typically within minutes, and only requires you to identify an individual's phone number or other identifying code (*e.g.*, a QR code or "$cashtag").

my own production company. Now it's time to get to work creating dope content….stay tuned!!!!"

26. DUA records reflect that, several months after CC-1 submitted THOMPSON's claim, THOMPSON provided additional information to DUA in an attempt to obtain additional PUA funds. This information included, among other things, (1) a photograph of THOMPSON holding his New York driver's license, (2) a photograph of THOMPSON's passport, and (3) a letter from TD Bank directed to THOMPSON at an address in Springfield, Massachusetts, dated December 3, 2020. Bank records reveal that while THOMPSON's address in New Jersey is the primary address for the TD account, in or about October 2020, the account was updated to include a Massachusetts address. Records available to law enforcement do not show any prior residential history for THOMPSON in Massachusetts. Based on my training and experience investigating financial fraud, I believe that THOMPSON likely changed his mailing address on the TD Bank account so that THOMPSON could appear to be a Massachusetts resident in order to defraud DUA.

*THOMPSON Sent Information to CC-1 for Other Fraudulent PUA Claims*

27. After CC-1 submitted THOMPSON's PUA claim, THOMPSON continued to work with CC-1 to submit additional fraudulent claims. DUA records reflect that, between April and June 2020, CC-1's IP address was used to file approximately 78 PUA claims that have paid out approximately $1,107,537 in PUA funds. Of those claims, 25 (which have paid out approximately $215,246 in DUA funds) were made on behalf of individuals who had both an out-of-state driver's license and out-of-state mailing address, and who otherwise do not appear to reside in Massachusetts. The investigation has identified multiple instances where THOMPSON provided information for those claims to CC-1 and received payments for doing so.

28. For example, on May 19, 2020 at 4:23 p.m., THOMPSON sent the following email to CC-1 with the subject line, "new clients", and listing the names and PII of three individuals

("Individual 1, Individual 2, and Individual 3"):



29. Less than two hours later, between approximately 5:45 p.m. and 6:22 p.m., PUA

claims were submitted from CC-1's IP address using the names and PII of Individual 1, Individual 2, and Individual 3.

30. Ten minutes later, at approximately 6:32 p.m., THOMPSON sent CC-1 another email with the subject line, "More family", and listing the names and PII of two more individuals ("Individual 4 and Individual 5"):



31. In the following hour, at 7:06 p.m. and 7:57 p.m., respectively, PUA claims were submitted from CC-1's IP address using the names and PII of Individual 4 and Individual 5.

32. Over the course of the following nine days, THOMPSON received payments from

each of these individuals into THOMPSON's TD Bank accounts, as reflected in the following chart:

| Date | Amount | Sender | Method |
|---|---|---|---|
| 5/22/20 | $2,700.00 | Individual 2 | Zelle[3] |
| 5/26/20 | $600.00 | Individual 3 | Zelle |
| 5/26/20 | $2,500.00 | Individual 1 | Zelle |
| 5/26/20 | $2,700.00 | Individual 4 | Wire |
| 5/28/20 | $1,900.00 | Individual 5 | Check[4] |

33.     Based on information available to law enforcement, and information that would have been known to THOMPSON, these five individuals were not eligible to receive PUA benefits from DUA.  For example:

  a. According to records THOMPSON provided to his bank in connection with a PPP[5] loan application, Individual 2 was THOMPSON's employee at Ocean of Laughs Productions, LLC (a New Jersey company) during 2019 and 2020.  Additionally,

---

[3] Zelle is an online payment application that allows individuals to send money directly between most U.S. bank accounts, typically within minutes, and only requires you to identify an individual's email address or mobile phone number.

[4] TD Bank records reveal that this check was deposited into THOMPSON's account on July 2, 2020.

[5] The Paycheck Protection Program ("PPP") provides forgivable loans to small businesses suffering from economic losses due to the Covid-19 pandemic.  The loans are processed by qualifying lender banks and fully guaranteed by the Small Business Administration.  PPP rules required that all loan funds be used for job retention and certain other business expenses.

        as THOMPSON stated in his email to CC-1, Individual 2 had a Pennsylvania driver's license and mailing address.[6]

    b. Both Individual 4 and Individual 5 are THOMPSON's family members[7] living in New York.  As THOMPSON stated in his email to CC-1, Individual 4 and Individual 5 have New York driver's licenses and mailing addresses, and records available to law enforcement do not show any prior residential history in Massachusetts for Individual 4 and Individual 5.

*Claims THOMPSON Filed Using* ▇▇▇▇▇▇▇▇▇*@gmail.com*

34. After working with CC-1 to submit fraudulent PUA claims from CC-1's IP address, THOMPSON continued submitting other fraudulent PUA claims from his own IP address. To file these claims, THOMPSON utilized THOMPSON's email as well as a second email that THOMPSON used to facilitate PUA fraud: ▇▇▇▇▇▇▇▇@gmail.com" ("the SEB email"). According to DUA records, between May and June 2020, THOMPSON's IP address was used to file 26 PUA claims, which have paid out approximately $122,899 in DUA funds. All of those claims were made on behalf of individuals who had both an out-of-state driver's license and

---

[6] Individual 2 had also previously filed an unemployment claim in Pennsylvania in 2020.

[7] As reflected above, THOMPSON's email to CC-1 referenced "new clients" that included a "father in law" and "brother in law". Shortly thereafter, THOMPSON sent another email with the subject line "more family" that listed Individual 4 and Individual 5. Based on THOMPSON's tax records, which THOMPSON provided in conjunction with a loan application to the Small Business Administration, THOMPSON's wife has the same last name as Individual 4 and Individual 5, thus indicating that Individual 4 and Individual 5 are indeed THOMPSON's father-in-law and brother-in-law.

an out-of-state mailing address, and who otherwise do not appear to reside in Massachusetts.

35.     On May 27, 2020, the SEB email was created from THOMPSON's IP address. On that same day, the SEB email began receiving emails from various individuals containing what appears to be their PII, including their name, SSN, date of birth, address, driver's license or state ID number, phone number, email address, bank routing number and bank account number. This is the type of information THOMPSON would need to file a PUA claim on behalf of another person.

36.     Also on that same day, the SEB email began receiving emails from THOMPSON's email with the subject lines, "Done", "Done 2", "Done 3", and so on. Those emails contain screenshots of what appear to be Massachusetts PUA claim and account information for the individuals who had previously emailed their PII to the SEB account. After the SEB email received the screenshots from THOMPSON's email, the SEB email would then forward the screenshots to the respective claimant, stating "done" or "claim processing".

37.     Below is one example of this process by which THOMPSON filed PUA claims on behalf of others that were fraudulent:

    a.  On May 27, 2020 at approximately 8:54 p.m., the SEB email received the following email containing PII for Individual 6:



b. Approximately one hour later, THOMPSON's email sent a screenshot to the SEB email, with the subject line "Done 4", showing Individual 6's PUA claim being processed.

c. Two minutes later, the SEB email forwarded that screenshot to Individual 6 with the subject line "Processing".

d. Records available to law enforcement, as well as information contained in THOMPSON's email, reflect that Individual 6 had a driver's license and residential address in Virginia at the time this PUA claim was submitted, and does not otherwise appear to reside in Massachusetts. Records available to law enforcement also do not show any prior residential history in Massachusetts for Individual 6.

38. Based on the above information, as well as my training and experience investigating access device fraud and financial fraud, there is probable cause to believe that THOMPSON used

the SEB email to hide his identity when communicating with individuals on whose behalf THOMPSON was filing fraudulent PUA claims. Specifically as to Individual 6, there is probable cause to believe that THOMPSON unlawfully submitted a PUA claim on behalf of Individual 6, and further, that Individual 6 was not entitled to receive PUA benefits.

## CONCLUSION

39. Based on the information described above, there is probable cause to believe that, on or about May 19, 2020, in the District of Massachusetts and elsewhere, THOMPSON, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, to wit, a PUA claim in the name and PII of Individual 6 to DUA, all in violation of Title 18, United State Code, Section 1343. A warrant for his arrest should issue.

Respectfully submitted,

*Jordan Knight*

JORDAN KNIGHT
Special Agent
U.S. Secret Service

Subscribed and sworn by telephone in accordance with Fed. R. Crim. P. 4.1

on August __19__, 2021.

DONALD L. CABELL
United States Magistrate Judge

14